COURT OF APPEALS OF VIRGINIA

Present:   Judges Beales, Powell and Alston
Argued at Richmond, Virginia


JEFFREY SCOTT DUPREE

                                              MEMORANDUM OPINION[*] BY
v.       Record No. 0519-09-3                JUDGE CLEO E. POWELL
                                                    MAY 4, 2010

COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF ROANOKE COUNTY
James R. Swanson, Judge

Jonathan Shapiro (Peter D. Greenspun; Greenspun, Shapiro,
Davis and Leary, P.C., on briefs), for appellant.

Josephine F. Whalen, Assistant Attorney General (Kenneth T.
Cuccinelli, II, Attorney General; Donald E. Jeffrey, III, Senior
Assistant Attorney General, on brief), for appellee.


        Jeffrey Scott Dupree ("Dupree") appeals his conviction for aggravated involuntary

manslaughter, in violation of Code § 18.2-36.1(B).  Dupree argues that the Commonwealth

failed to prove that his impact with Nininger's vehicle caused the victim's death as required

under Code § 18.2-36.1(A).  In the alternative, Dupree contends that the evidence was

insufficient to prove that his conduct "was so gross, wanton and culpable as to show a reckless

disregard for human life," as required under Code § 18.2-36.1(B).  Finally, he contends that,

even if the evidence were sufficient, there were independent, intervening acts which caused the

fatal injury.

        [*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

BACKGROUND

On the evening of February 19, 2008, Tracie Dowell Nininger ("Nininger") met friends for dinner at a restaurant in Roanoke, Virginia, where she had two glasses of wine with her meal. At about 8:30 p.m., she left the restaurant and met another friend at a different restaurant in Roanoke, where she had another two glasses of wine. She left the second restaurant around 9:30 p.m.

Nininger next went to Cornerstone Bar and Grill, where she met up with Dupree. While there, Nininger had another glass of wine. Dupree, on the other hand, later admitted to having a "couple" of beers. Additionally, both Dupree and Nininger consumed at least one "shooter." By 12:00 a.m., February 20, 2008, Nininger and Dupree were noticeably intoxicated. At one point, Nininger lost her balance and fell to the floor, dragging Dupree down with her. Based on this behavior, the manager of Cornerstone asked them to leave. Nininger and Dupree subsequently gathered their belongings, paid their bills, and left the establishment. Nininger proceeded to her 2006 Hummer H3 and drove off with Dupree following her in his 2008 Chevy Avalanche.

Meanwhile, that same night Draper Paving Company was repaving a trench on the right side of Electric Road located in the outskirts of Roanoke. The repaving required the closure of the right lane of Electric Road, a four lane divided highway. To facilitate the closure, a diagonal line of cones was placed in the road to channel drivers from two lanes of traffic down to only the left lane. When the diagonal line of cones had completely blocked the right lane, the line straightened and followed the center stripes up to and beyond the construction zone.

Richard Slone ("Slone"), was operating his dump truck within the construction zone. Slone's dump truck, which was carrying asphalt, was parked parallel to the traffic lane within the closed right lane. A backhoe, operated by James Harmon ("Harmon"), was positioned behind the dump truck, also facing forward. On its front end was a large bucket; on the rear, affixed to a

hydraulic arm, was a scraping blade that was approximately seven feet wide. The blade, which was not in use, was raised up approximately three feet off the ground.

When more asphalt was needed to fill an area of the trench, Slone would dump it into the bucket of the backhoe. Harmon would then maneuver the backhoe perpendicular to the dump truck so that the bucket was over the open trench, and drop the asphalt in. In performing that maneuver, Harmon would necessarily have to back the backhoe up and move into the open left lane. As the backhoe was 21 feet long, even when the bucket was over the trench, the blade would hang into the open left lane.[1] For safety reasons, a flagman would stop traffic in the left lane whenever the maneuver was being performed.[2]

At approximately 12:30 a.m., more asphalt was needed for the trench. However, Earl Murray, who had been working as the flagman that night, had traveled back to the Draper Paving Company headquarters to get some supplies. As a result, Robert Hawks ("Hawks"), moved into position to act as flagman. Hawks stood on the dotted line between the right and left lanes, facing oncoming traffic approximately 60 feet from the rear of the backhoe. At the time he was wearing a reflective vest and carrying a large stop sign.

After filling the bucket of the backhoe, Harmon began to maneuver the backhoe into position to dump the asphalt into the trench. At some point, Slone got out of the dump truck and was standing near its rear tires. When Harmon had finished backing up and was moving forward, Hawks noticed two vehicles, driven by Nininger and Dupree, approaching the

---

[1] It is unclear from the record how far the backhoe encroached into the left lane. The trial court determined that, at the time of the accident, the blade hung between 2.4 and 3.2 feet into the open left lane.

[2] The evidence demonstrates that, on the night of the accident, the flagman carried a large sign reading "stop" on one side and "slow" on the other to halt traffic. As counsel pointed out at trial, this was a violation of VDOT regulations, as the regulations mandate that, at night, a flagman must also be illuminated.

construction site.  Hawks attempted to stop the vehicles, however he quickly realized that neither vehicle was slowing down.  As the vehicles passed Hawks, he noted that Dupree's Chevy Avalanche was only one or two car lengths behind Nininger's Hummer H3.

Hawks watched as Nininger collided with the blade of the backhoe and then Dupree collided with Nininger.  The combined force of the two impacts caused the backhoe to rotate clockwise, driving the blade of the backhoe into Slone, pinning him against the dump truck and virtually ripping him in half.  As a further result of the impact between the two vehicles, paint from Nininger's license plate was transferred to Dupree's vehicle leaving a backwards "5" on Dupree's bumper.

At the time of the collision, Officer Sean Chuyka of the Roanoke County Police Department was on patrol nearby.  His window was down, and he heard what sounded like a small explosion near Electric Road.  He drove toward the sound to investigate.  En route, he received a call from dispatch informing him of the crash.

As Officer Chuyka arrived on the scene, he noticed Hawks, stop sign still in his hand, running from the crash site toward a nearby intersection to stop traffic from entering the now blocked lane.  Officer Chuyka parked his cruiser in the road to block traffic and went to the crash site to check for injuries.  He found Dupree still in his vehicle and Nininger standing between the Avalanche and the Hummer.  Officer Chuyka spoke to each of them and determined they were not injured.

While Officer Chuyka was speaking with Dupree and Nininger, one of the members of the Draper crew approached him and told him Slone had been badly injured.  The crew member led Officer Chuyka to Slone, who was caught between the dump truck, the backhoe, and Nininger's Hummer.  Slone was asking for help and starting to lose consciousness.  Officer

Chuyka immediately called dispatch, advised that someone was seriously hurt, and made sure an ambulance was en route. Slone later died as a result of his injuries.

Officer Chuyka then went back to Dupree, who was still seated in the Avalanche. The door to the Avalanche was jammed, so Officer Chuyka helped Dupree climb through the window. Officer Chuyka noticed Dupree's speech was badly slurred and hard to understand. Officer Chuyka also noticed Dupree smelled strongly of alcohol, his eyes were glassy, watery, and bloodshot, and his pupils were dilated. Furthermore, Dupree was unsteady on his feet and had trouble standing straight.

Dupree admitted that he had had a couple beers at Cornerstone Bar. Officer Chuyka asked Dupree to perform a series of field sobriety tests, and Dupree agreed. Dupree performed poorly. Officer Chuyka arrested Dupree, informed him of his rights, and informed him of the implied consent law. Dupree, however, refused to take a blood-alcohol test.

The subsequent investigation revealed that, according to the Hummer H3's event data recorder ("EDR"),[3] Nininger was traveling at 37 mph and never attempted to brake or swerve to avoid the blade of the backhoe. The Chevy Avalanche's EDR revealed that Dupree was traveling at 38 mph and he applied his brakes a half-second before he collided with Nininger.

Dupree was charged with one count of driving under the influence, in violation of Code § 18.2-266, and one count of aggravated involuntary manslaughter, in violation of Code § 18.2-36.1(B). Dupree pled guilty to driving under the influence, and not guilty to aggravated involuntary manslaughter. He elected to have a bench trial as opposed to a jury trial.

At trial, Dr. Christina Roberts, the medical examiner, testified that Slone suffered "extensive traumatic injuries to the lower part of his torso." Dr. Roberts explained that these

---

[3] Officer Christian explained that he accessed the EDR in each vehicle using a Crash Data Retrieval System connected to the diagnostic port of the vehicle.

injuries resulted in "lacerations . . . of the femoral arteries and veins and all of the small arteries and veins within the pelvis and the trunk." Dr. Roberts further explained that, due to the massive, traumatic blood loss, the injury was fatal, but the combined pressure of the blade of the backhoe and the dump truck temporarily slowed the flow of blood from Slone's body. As a result, Slone was still conscious and asking for help when police first arrived at the scene of the accident minutes later.

In finding Dupree guilty of aggravated involuntary manslaughter, the trial court explained:

> As to the gross, wanton, and culpable component of the Commonwealth's case, I conclude from the evidence that both Defendants Nininger and Dupree were significantly impaired by their alcohol consumption prior to the accident . . . .
>
>       *     *     *     *     *     *     *
>
> In Mr. Dupree's case, he was at one to two car lengths behind the Nininger vehicle at 37, 38 miles-per-hour. In my view, he was following so closely that there was nothing he could have done, even had he been in a position to anticipate whatever was going to happen with the vehicle in front of him.
>
> While I'm not saying that it is fair . . . to have attributed to Mr. Dupree the same observational duties as I have attributed . . . to Mrs. Nininger, the fact is that even if it is reasonable to assume or to conclude that there was no reason for Mr. Dupree to have assumed the vehicle immediately in front of him was going to get hung up on a tractor blade sticking out in the middle of the lane of travel, the fact is that by following as closely as he was, he put himself in a position whereby there was nothing he could have done about it, even had he been . . . in a position to make that observation, and that in my judgment constitutes a violation of the duty, and he was following too closely.
>
> Finally, I'm satisfied that insofar as the impacts, the impacts between the Nininger vehicle and the blade of the tractor, and the impact between the Dupree Avalanche and the Nininger Hummer, that they were so -- they occurred so close in time that they were virtually simultaneous and that they combined to put into play the forceful impact that ultimately took the life of Mr. [Slone].

Dupree appeals.

ANALYSIS

When considering the sufficiency of the evidence, an appellate court views the evidence in the light most favorable to the Commonwealth, the prevailing party at trial. Commonwealth v. Hudson, 265 Va. 505, 514, 578 S.E.2d 781, 786 (2003) (citation omitted). On review, an appellate court should not substitute its judgment for that of the trier of fact. Cable v. Commonwealth, 243 Va. 236, 239, 415 S.E.2d 218, 220 (1992).

A court considering a challenge to the sufficiency of the evidence does not "ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 318-19 (1979) (citation omitted). Rather, the relevant question is whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Id. at 319. This understanding of the standard of review recognizes the responsibility of the trier of fact to weigh the evidence and resolve conflicting testimony. Kelly v. Commonwealth, 41 Va. App. 250, 257, 584 S.E.2d 444, 447 (2003) (en banc).

Causation

Dupree initially argues that the Commonwealth failed to prove beyond a reasonable doubt that his impact with Nininger's vehicle caused Slone's death. Specifically, Dupree contends that the only evidence of his guilt was circumstantial and the trial court's finding that his impact with Nininger's vehicle was a concurrent cause of Slone's death is "pure speculation." Dupree notes that the only evidence of the "mechanics" of the crash is the paint transfer from Nininger's license plate to Dupree's bumper. He further states that there is no evidence regarding whether Dupree's subsequent impact added to the force imparted to the backhoe blade by Nininger's impact. Finally, he posits that the trial court's factual findings are plainly wrong, as the EDR evidence demonstrates that he was almost 100 feet behind Nininger at the time of the

initial collision. The Commonwealth, however, argues that Dupree never made these arguments before the trial court and is therefore barred from making them for the first time before this Court. See Rule 5A:18.

Rule 5A:18 provides that "[n]o ruling of the trial court . . . will be considered as a basis for reversal unless the objection was stated together with the grounds therefor at the time of the ruling, except for good cause shown or to enable the Court of Appeals to attain the ends of justice." "The purpose of Rule 5A:18 is to provide the trial court with the opportunity to remedy any errors so that an appeal is not necessary." Knight v. Commonwealth, 18 Va. App. 207, 216, 443 S.E.2d 165, 170 (1994).

It is well established that, "in a bench trial, where a defendant wishes to preserve a sufficiency motion after presenting evidence, the defendant must make a motion to strike at the conclusion of all the evidence, present an appropriate argument in summation, or make a motion to set aside the verdict." Howard v. Commonwealth, 21 Va. App. 473, 478, 465 S.E.2d 142, 144 (1995); see also Rule 5A:18.

At no point during the trial did Dupree raise the issues of causation that he now argues. In his reply brief, Dupree contends that he did raise the issue of causation by adopting the argument of Nininger, his codefendant. He is incorrect.

The causation argument raised by Nininger at trial dealt primarily with whether her intoxication was a proximate cause of the accident. Counsel for Nininger specifically argued that her intoxication was not a proximate cause of the accident, stating that "the sole cause of this wreck . . . was when the [backhoe] came out in Mrs. Nininger's way . . . ." She did not argue, nor would it have logically made sense for her to argue, about the mechanics of Dupree's impact with her vehicle or whether the subsequent impact was a concurrent cause of the accident. Dupree, however, takes this argument out of context, contending that it stands for the notion that

"the sole cause of the accident was Nininger's crash." Thus, it is apparent that Dupree did not make the argument to the trial court, either directly or by adoption, that he now makes on appeal.

In the alternative, Dupree submits that we should consider his argument under the ends of justice exception to Rule 5A:18.

As we have repeatedly admonished, "the ends of justice exception is narrow and is to be used sparingly." Brown v. Commonwealth, 8 Va. App. 126, 132, 380 S.E.2d 8, 10 (1989). "In order to avail oneself of the exception, a defendant must affirmatively show that a miscarriage of justice has occurred, not that a miscarriage might have occurred." Redman v. Commonwealth, 25 Va. App. 215, 221, 487 S.E.2d 269, 272 (1997).

> We will not invoke the exception if the record suggests that the Commonwealth merely inadvertently or unknowingly failed to adduce adequate proof of an element of the offense. In order to show that a miscarriage of justice has occurred, thereby invoking the ends of justice exception, the appellant must demonstrate that he or she was convicted for conduct that was not a criminal offense or the record must affirmatively prove that an element of the offense did not occur.

Id. at 221-22, 487 S.E.2d at 272-73.

Dupree's ends of justice argument subsumes his sufficiency argument. His entire argument is that the Commonwealth failed to prove an element of the offense. Under Dupree's approach, in order to determine whether the ends of justice exception applies, this Court would first have to determine whether the evidence was sufficient. Such an approach would "obviate the requirement for making an adequate motion to strike or a contemporaneous objection that the evidence was insufficient." Id. at 221, 487 S.E.2d 272. If Dupree's approach were the proper one, Rule 5A:18 would never apply, except when it does not matter.

At no time does he argue that the conduct for which he was convicted was not a criminal offense.  Similarly, nothing in the record affirmatively proves that an element of the offense did not occur.[4]  As such, the ends of justice exception does not apply.

Aggravation

Dupree next argues that, because there was no concrete evidence regarding his level of intoxication, the only aggravating factor was the fact that he followed too closely behind Nininger.  He contends that assuming he was only one or two car lengths behind Nininger, the evidence is insufficient to prove that his conduct was "so gross, wanton and culpable as to show a reckless disregard for human life."

We begin by noting that this Court has previously held that,

> in determining whether the evidence was sufficient to convict appellant under Code § 18.2-36.1(B), we may consider both (1) cases defining the parameters of the term, "criminal negligence," and (2) cases involving the sufficiency of the evidence to prove the criminal negligence required for a common law involuntary manslaughter conviction.

Wyatt v. Commonwealth, 47 Va. App. 411, 417, 624 S.E.2d 118, 121 (2006).

Thus, in order to convict under Code § 18.2-36.1(B), the Commonwealth must prove that Dupree's "drinking and driving behavior was accompanied by criminal negligence." Id. at 418, 624 S.E.2d at 122.  However, "[t]he mere happening of an accident, coupled with evidence that the offender had been drinking and that the accident was his fault, does not prove criminal negligence as a matter of law." Id.

---

[4] Although Dupree attempts to argue that the record does affirmatively prove his innocence, we note that this argument is based on speculation as to what caused him to apply his brakes.  As the record is devoid of any evidence to support his inference that the stimulus for his decision to apply the brakes was Nininger's collision with the backhoe, it cannot be said that the record affirmatively proves his innocence.

- 10 -

It is well established that, to prove criminal negligence, the Commonwealth must prove that

> the conduct of the driver constitutes a great departure from that of a reasonable person (gross, wanton or willful conduct) which creates a great risk of injury to others and where by the application of an objective standard the accused should have realized the risk created by his conduct.

Keech v. Commonwealth, 9 Va. App. 272, 280, 386 S.E.2d 813, 817 (1989).

In the present case, Dupree engaged in a myriad of activities that, when combined, "constitutes a great departure from that of a reasonable person." Id. Although Dupree admits that he was intoxicated, he argues that "there was no showing and no finding by the court that his intoxication was extreme." Again Dupree is in error. The trial court specifically found that he was significantly impaired. Further, there is ample evidence in the record to support the trial court's finding that Dupree's intoxication was extreme. At trial, Dr. Burrows, a forensic toxicologist, testified that at a BAC of .15, a person's balance and speech start to be affected. The evidence demonstrates that Dupree's speech was significantly slurred and he was unable to maintain his balance during the field sobriety tests. There is also evidence that Dupree's level of intoxication affected his perception. Although the evidence demonstrates that the construction site was well illuminated and marked off with cones and at least one flashing arrow, Dupree told Officer Chuyka that "the area was not lit[] and there was absolutely no warning that there was a construction zone ahead." Accordingly, there is ample evidence for the trial court to infer that he was "significantly impaired."

In addition to the findings by the trial court that Dupree was "significantly impaired" and following too closely behind Nininger, the evidence reveals that, based on Nininger's behavior at the bar (i.e. falling down on the dance floor), Dupree also knew or should have known that

Nininger was significantly intoxicated. Furthermore, there is evidence that immediately prior to the accident, Dupree was attempting to call Nininger on her cell phone.

Thus, the evidence, when taken as a whole reveals that shortly before the accident, a highly intoxicated Dupree, whose perception was greatly compromised, was using his cell phone while following too closely behind another highly intoxicated[5] driver (Nininger) whom he knew to be highly intoxicated. We hold that such behavior "constitutes a great departure from that of a reasonable person (gross, wanton or willful conduct) which creates a great risk of injury to others." Id.

Intervening Acts

Finally, Dupree argues that, even if he was negligent, there were independent, intervening acts which caused the fatal injury. Specifically, Dupree contends that Nininger's negligence, Hawks' negligence, and Harmon's negligence combined to cause the fatal accident; therefore, any negligence on his part was remote.

> There can be more than one proximate cause [of an incident] and liability attaches to each person whose negligent act results in the victim's injury or death. Maroulis v. Elliott, 207 Va. 503, 510, 151 S.E.2d 339, 344 (1966). To be an intervening cause . . . [an incident] must have been an event which [the defendant] could not have foreseen. "An intervening act which is reasonably foreseeable cannot be relied upon as breaking the chain of causal connection between an original act of negligence and subsequent injury." Delawder v. Commonwealth, 214 Va. 55, 58, 196 S.E.2d 913, 915 (1973).

Gallimore v. Commonwealth, 246 Va. 441, 447, 436 S.E.2d 421, 425 (1993).

As a reasonably prudent person should or would have foreseen the inherent risk involved in one intoxicated driver following another intoxicated driver too closely, Nininger's actions cannot be considered unforeseeable. The evidence clearly demonstrates that Dupree knew or

---

[5] It is undisputed that Nininger's BAC was .19%.

should have known that she was intoxicated. Therefore, any negligence on her part cannot be considered an intervening cause. See Delawder, 214 Va. at 58, 196 S.E.2d at 915.

Additionally, we note that,

> in order to excuse the defendant's negligence, this intervening cause must be either a superseding or responsible cause. To be a superseding cause, whether intelligent or not, it must so entirely supersede the operation of the defendant's negligence, that it alone, without the defendant's contributing negligence thereto in the slightest degree, produces the injury.

Richmond v. Gay's Adm'x, 103 Va. 320, 324, 49 S.E. 482, 483 (1905).

Any negligence on the part of Hawks and/or Harmon cannot be said to be "independent." The record clearly demonstrates that Dupree and Nininger initiated the chain of events that ultimately ended in Slone's death. See Gallimore, 246 Va. at 447, 436 S.E.2d at 425 (holding there was no independent, intervening act where "[the defendant's] negligent acts and omissions exposed [the victim] to the subsequent negligent act which ultimately resulted in his death"). The record is devoid of any evidence that the negligence on the part of Harmon or Hawks alone would have led to any injury. Thus, it cannot be said that their negligence superseded Dupree's.

Finally, it is well established that an intervening act must break the causal connection between the defendant's act of negligence and the subsequent injury. See Scott v. Simms, 188 Va. 808, 817, 51 S.E.2d 250, 253 (1949) (recognizing that an intervening cause must break "the sequence of events following a negligent act"); see also Gallimore, 246 Va. at 447, 436 S.E.2d at 425. Thus, by definition and by application, an intervening, independent act must occur *after* the defendant's negligent act; any acts occurring before the defendant's negligent act cannot, by definition, be an intervening act. Accordingly, any alleged negligence on the part of Harmon, Hawks, or Nininger cannot be considered an independent, intervening act that severs the causal connection between Dupree's negligence and Slone's death.

## CONCLUSION

For the foregoing reasons, we affirm the decision of the trial court.

<u>Affirmed.</u>